## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **RALPH MLASKA, #B-10587,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 15-cv-00918-MJR** |
| ) | |
| **DR. LOUIS SCHICKER,** ) | |
| **WEXFORD HEALTH SOURCES,** ) | |
| **ILLINOIS DEPT. OF CORRECTIONS,** ) | |
| **S. A. GODINEZ/JOHN R. BALDWIN,** ) | |
| **DR. ALFONSO DAVID,** ) | |
| **MARY MILLER,** ) | |
| **CAMILLA ETIENNE,** ) | |
| **ALLEN MARTIN,** ) | |
| **ROBERT HILLIAD,**[1] ) | |
| **SHERRI STOKES LYNN,** ) | |
| **and KURTIS HUNTER,** ) | |
| ) | |
| **Defendants.** ) | |

## <u>MEMORANDUM AND ORDER</u>

**REAGAN, Chief District Judge:**

This matter is now before the Court for preliminary review of the amended complaint (Doc. 12) that Plaintiff Ralph Mlaska filed on September 11, 2015. Mlaska, an inmate who is currently incarcerated at Shawnee Correctional Center ("Shawnee"), claims that he has been denied adequate medical testing and treatment for penile and testicular pain at three different prisons during the past nine years. Mlaska has already filed two other federal lawsuits to address his claims of inadequate medical care at two of these institutions, including Western Illinois Correctional Center ("Western"), *Mlaska v. Shah*, 428 Fed. Appx. 642 (7th Cir. 2011), and

---

[1] In the amended complaint, this defendant is referred to as "Robert Hilliad" and "Robert Hilliard" interchangeably. Consistent with the spelling of this party's name in the case caption, the Court will refer to him as "Robert Hilliad" throughout the Order.

Danville Correctional Center ("Danville"), *Mlaska v. Talbot*, 571 Fed. Appx. 483 (7th Cir. 2014). Neither case was decided in his favor.

Mlaska now sues twelve defendants[2] for denying him proper care while at Shawnee. He asserts claims against the defendants pursuant to 42 U.S.C. §§ 1983 and 1985, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2689, *et seq*., and Illinois state law (Doc. 12). Mlaska seeks declaratory judgment, injunctive relief, and monetary damages (Doc. 12, p. 27).

The case was transferred to this District from the United States District Court for the Northern District of Illinois on August 19, 2015 (Doc. 8). Along with an unsigned complaint (Doc. 1), Mlaska filed a motion seeking a temporary restraining order and/or preliminary injunction (Doc. 4).[3] On August 24, 2015, this Court entered an Order requiring Mlaska to file a properly signed complaint within thirty-five days or face dismissal of this action (Doc. 10). On the same date, the Court denied his request for a temporary restraining order and held his request for a preliminary injunction in abeyance pending preliminary review of his complaint (Doc. 11).

Mlaska responded by filing a properly signed *amended* complaint[4] (Doc. 12) and motion to appoint counsel (Doc. 13) on September 11, 2015. He also filed a motion for prospective declaratory judgment (Doc. 14) and an order to show cause for a temporary restraining order

---

[2] These defendants include Wexford Health Sources ("Wexford"), the Illinois Department of Corrections ("IDOC"), S.A. Godinez/John R. Baldwin (former and acting IDOC director), Louis Schicker (IDOC medical director), Kurtis Hunter (warden), Allen Martin (warden), Robert Hilliad (assistant warden), Camilla Etienne (assistant warden of programs), Alfonso David (medical director), Sherri Stokes Lynn (health care unit administrator), and Mary Miller (Danville health care unit administrator).
[3] Mlaska also filed a motion seeking leave to proceed *in forma pauperis* (Doc. 3), which was granted on September 25, 2015 (Doc. 15).
[4] The amended complaint supersedes and replaces the original, rendering the original complaint (Doc. 1) void. *See Flannery v. Recording Indus. Ass'n of Am.,* 354 F.3d 632, 638 n. 1 (7th Cir. 2004).

and/or preliminary injunction[5] on September 24, 2015. The amended complaint (Doc. 12) and pending motions (Docs. 4, 13, 14) are now before this Court for consideration.

## **Merits Review Under 28 U.S.C. § 1915A**

Pursuant to 28 U.S.C. § 1915A, the Court is required to promptly screen prisoner complaints to filter out nonmeritorious claims. 28 U.S.C. § 1915A(a). When doing so, the Court must dismiss any portion of the complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief. 28 U.S.C. § 1915A(b). This same standard applies to amended complaints.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id.* at 557. Conversely, a complaint is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the Court is obligated to accept factual allegations as true, *see Smith v. Peters*, 631 F.3d 418, 419 (7th Cir. 2011), some factual allegations may be so sketchy or implausible that they fail to provide sufficient notice of a plaintiff's claim. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). Additionally, Courts "should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements." *Id.* At the same time, however, the factual

---

[5] This document was received by the Court but not docketed in CM/ECF. The CLERK shall be DIRECTED to DOCKET the proposed pleading as the "Second Motion for Temporary Restraining Order and/or Preliminary Injunction."

allegations of a *pro se* complaint are to be liberally construed.  *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).   The amended complaint survives preliminary review under this standard.

### Amended Complaint

According to the amended complaint, Mlaska has suffered from penile pain since 2006 (Doc. 12, p. 4).  He has seen doctors at three different institutions, including Western, Danville, and Shawnee.  He has also seen three urologists.  Even so, Mlaska claims that his treatment has been uniformly inadequate and ineffective.

Although the below section describes events that occurred at all three prisons, Mlaska's claims against the twelve defendants arise from inadequate medical care he received while at Shawnee.  Allegations addressing his care at Western and Danville are therefore offered only as background information.

**A.     History of Condition**

For nine years, Mlaska has suffered from pain that he attributes to a nodule in his penis (Doc. 12, p. 4).  The pain was exacerbated by prolonged and unprovoked erections, known as priapisms, that he suffered as a side effect of the Trazodone he was prescribed.  The amended complaint does not indicate whether he is still taking this medication.

During one priapism that occurred in 2009, Mlaska felt a sharp tear, followed by the sensation of fluid shooting above the nodule through the left side of his urethra (Doc. 12, p. 5).  Although the nodule subsided following this incident, he continued to suffer from extremely painful erections.

Eventually, Mlaska alleges that he lost erectile and spermatic function and suffered from pain throughout the "venous tree," scrotum, abdomen, and superficial rectum.  He allegedly

developed hydroceles, an inguinal hernia, an umbilical hernia, elongated spermatic cords, hemorrhoids, blood pressure problems, and dizziness[6] (Doc. 12, p. 16).

**B.      Treatment of Condition at Western and Danville**

After complaining about the condition for "years," Plaintiff was finally referred to a specialist in 2010 (Doc. 12, p. 5).  The urologist, Doctor Charles Wilson, did not find a nodule. He became angry and stated that "he would not allow Plaintiff 'to cruise the State for errectile (sic) dysfunction testing'" (*id*).  Doctor Wilson told Mlaska that the test he needed was available in Springfield, but he left the referral decision up to Mlaska's institution.

Back at Western, Doctor Vipin Shah diagnosed the problem as vascular in nature (*id*.). He ordered an angiogram, based on the recommendation of the urologist.  However, the request for the angiogram was denied because Mlaska had already refused to undergo a cystogram.[7] Doctor Shah submitted a second order for an angiogram or Doppler sonogram, with no success.

Mlaska transferred to Danville.  There, nurses allegedly witnessed his distress, testicular swelling, discoloration, and odd gait.  Doctor Talbot examined Mlaska but only observed rectal swelling.  Wexford's regional director, Doctor Funk, examined Mlaska and ordered a scrotal ultrasound.  The test allegedly revealed the presence of cysts.  He was again referred to a specialist.

Mlaska met with a second urologist, Doctor Wolf, on an undisclosed date (*id*.). The specialist recommended a Doppler vascular study.  Before the study could be performed, Mlaska transferred to Shawnee (Doc. 12, p. 6).

---

[6] Mlaska does not claim that he has received inadequate medical care for these conditions.
[7] Mlaska alleges that he refused the cystogram because he considered it "unwarranted painfull (sic) [and] intrusive" (Doc. 12, p. 11).

### C.      Treatment of Condition at Shawnee

Once at Shawnee, Mlaska received a scrotal ultrasound on October 12, 2012 (Doc. 12, pp. 5, 8).  It is this ultrasound that gives rise to Mlaska's claims.  According to the amended complaint, two doctors, Doctors Larson and Sheppard,[8] recommended that the ultrasound include penile reads (Doc. 12, p. 6).  During the procedure, the ultrasound technician, named "Jim,"[9] asked Mlaska to identify the problem area.  Mlaska identified several, and the technician took penile reads of them.  The technician then indicated that he found "the culprit," which Mlaska refers to as the "rupture site" or the "claimed rupture" throughout the amended complaint (Doc. 12, p. 8).

Mlaska was later told that the results of the ultrasound were negative (Doc. 12, p. 6).  He does not seem to know exactly why, given the technician's comment that he found "the culprit."  The amended complaint offers three possibilities: (1) the technician inadvertently omitted his findings from the penile reads; (2) the technician included the findings from the penile reads in the final report but the defendants ignored them; or (3) the defendants falsified the records.

What followed was a series of failed attempts by Mlaska to secure treatment for his self-described "rupture."  Unfortunately for Mlaska, several prison officials identified his condition as psychosomatic (Doc. 12-1, p. 18).  Mlaska alleges that this is because a Danville nurse, Mary Miller, emailed the medical staff at Shawnee in late 2012 and described Mlaska as a "trouble maker [and] perverted malingerer"[10] (Doc. 12, p. 6).  He opines that the email biased Shawnee officials and amounted to a conspiracy to deny him adequate medical care.

---

[8] Neither of these doctors is named as a defendant in this action.
[9] This individual is also not named as a defendant in this action.
[10] Although the amended complaint refers to an exhibit in support of this allegation, the Court could find no such email from this defendant.

Mlaska took matters into his own hands.  He went on a hunger strike and threatened to commit suicide in an attempt to secure treatment for his condition in 2013[11] (Doc. 12, p. 9). Mlaska admittedly cut his own penis in an effort to secure treatment at a hospital in 2013. This followed threats he made to medical staff to perform his own circumcision (Doc. 12-1, pp. 15, 47).  In April 2015, he again cut his penis and was taken to a hospital emergency room for treatment (Doc. 12-1, p. 32).  Despite his efforts, Mlaska has not yet obtained the specific diagnostic testing and treatment he desires and, which he claims, the experts recommend.

To control his symptoms of pain and suspected bleeding, Mlaska ties a strip of cloth around his penis (Doc. 12-1, p. 50).  According to his medical records, he has been using this technique since 2013. Although it helps, Mlaska alleges that the technique is becoming less effective.

**D.      Allegations Against Defendants**

The amended complaint sets forth the following allegations against each of the twelve defendants:

> **Defendant Wexford** instituted a policy, custom, or practice of undertreating Mlaska; failed to adequately train or supervise its employees on accurate medical charting, falsification of records, production of medical records, and timely processing of referrals (Doc. 12, pp. 17-19); referred Mlaska to a third urologist but did not approve the tests the urologist recommended (i.e., duplex Doppler penile study and angiogram) (Doc. 12, p. 7); approved alternative, clearly ineffective, and more costly testing (i.e., MRI) (Doc. 12, p. 13); and, yet, instituted policies that elevated concerns regarding the cost of care over the quality of care (Doc. 12, p. 14);

> **Defendants IDOC, Godinez,** and **Baldwin** created and/or implemented policies, customs, or practices that deprived Mlaska of adequate medical care (Doc. 12, p. 2);

> **Defendant Schicker** created and/or implemented a policy, custom, or practice of undertreating Mlaska by ignoring his test results (Doc. 12, pp. 1, 3); told Wexford

---

[11] According to the medical records that were submitted with the amended complaint, Mlaska also demanded placement in a better cell.

that his penile reads were taken and were normal (Doc. 12, pp. 7-8); refused to order recommended diagnostic testing and instead ordered ineffective testing (i.e., MRI) (*id.*);

**Defendant Hunter** told Mlaska on June 5, 2015, that Wexford would not pay for the testing he seeks, even though an MRI costs more (Doc. 12, p. 13);

**Defendant Martin** told Mlaska that he could not make Defendants Schicker or David do anything (Doc. 12, p. 9);

**Defendant Hilliad** responded to Mlaska's 2013 hunger strike and self-inflicted wound(s) by telling an officer, in Mlaska's presence that "Mlaska is only pulling this sh*t because he needs an operation and he knows it" (Doc. 12, p. 9); failed to adequately train or supervise employees on accurate medical charting, falsification of records, production of medical records, and timely processing referrals (Doc. 12, pp. 17-19);

**Defendant Etienne** repeatedly told Mlaska during his 2013 hunger strike that Defendant David was working on ordering a duplex Doppler examination even though he was not (Doc. 12, p. 9); told Mlaska that she could not make Defendants Schicker or David do anything (*id.*); ignored another Shawnee doctor's orders for a penile and scrotal ultrasound (Doc. 12, pp. 15-16);

**Defendant David** told Wexford that penile reads were taken and were normal (Doc. 12, pp. 7-8); denied that Mlaska was suffering from any other symptoms (Doc. 12, p. 7); refused to approve the diagnostic tests that were ordered by the third urologist (*id.*); ordered alternative and clearly ineffective diagnostic testing (i.e., an MRI and prostate exams) in order to claim that Mlaska's condition is psychosomatic (Doc. 12, pp. 7-8, 21); corrected Mlaska on January 3, 2013, when he complained about his "busted" artery by indicating that it was a vein (Doc. 1, p. 9); admitted to Mlaska on December 12, 2014, that the reason he refused to send him for a Doppler study even after the third urologist recommended it was because Mlaska tried to sue him (Doc. 12, p. 12);

**Defendant Lynn** responded to Mlaska's request for surgical repair of the "rupture site" by stating that the decision was up to Wexford and not her (Doc. 12, p. 6); told Mlaska that she could not make Defendants Schicker or David do anything (Doc. 12, p. 9); ignored another Shawnee doctor's orders for a penile and scrotal ultrasound (Doc. 12, pp. 15-16); and

**Defendant Miller** engaged in a conspiracy against Mlaska by sending an email to Shawnee officials that described Mlaska as a "perverted malingerer" (Doc. 12, pp. 11-12).

(Doc. 12, pp. 4-27).

Mlaska now claims that the defendants violated his rights under federal and state law. He seeks declaratory judgment and monetary damages (Doc. 12, p. 10).  He also seeks an injunction, in the form of an order requiring the defendants to produce the results of the 2012 ultrasound and an order for a comprehensive examination and treatment plan from an independent expert (Doc. 12, p. 10)

### E.   Litigation History

Mlaska has admittedly filed four other lawsuits related to this condition.  He filed two actions in federal court.  In the first, he sued officials at Western for denying him appropriate medical care in violation of the Eighth Amendment.  *Mlaska v. Shah*, 428 Fed. Appx. 642 (7th Cir. 2011).  His complaint was dismissed without prejudice at screening because he failed to exhaust his administrative remedies before commencing the action.  His motion to reconsider the decision was denied.  The Seventh Circuit affirmed the decision on appeal.  *Id.*

In the second federal suit, Mlaska sued officials at Danville for violating his privacy rights and for responding with deliberate indifference to his complaints of penile and testicular pain, also in violation of the Eighth Amendment.  *See Mlaska v. Talbot*, 571 Fed. Appx. 483 (7th Cir. 2014).  The second action did not survive summary judgment.  The Seventh Circuit also affirmed this decision on appeal.  *Id.*

In addition, Mlaska filed two lawsuits in Illinois state court (Doc. 12, p. 3). One challenges the decision to withhold certain medical records from him in response to a request he made under the Freedom of Information Act ("FOIA").  The other addresses claims that are "related" to this action.  The results of the state court actions are unknown.

<u>Discussion</u>

In order to promptly address Mlaska's latest request for a temporary restraining order and expedite review of Mlaska's requests for preliminary injunctive relief, the Court has sifted through the amended complaint and identified the following claims for review pursuant to 28 U.S.C. § 1915A. In accordance with the objectives of Federal Rules of Civil Procedure 8(e) and 10(b), each claim is identified in a separate paragraph below:

**Count 1:** **Defendants exhibited deliberate indifference to Mlaska's medical needs when they delayed and ultimately denied the expert-recommended diagnostic testing for his "rupture" and/or instituted policies, customs, and practices that resulted in said denial, in violation of the Eighth Amendment;**

**Count 2:** **Defendants conspired to deny Mlaska proper medical care for his claimed "rupture," in violation of 42 U.S.C. §§ 1983 and 1985;**

**Count 3:** **Defendants Schicker, David, Etienne, and Lynn retaliated against Mlaska for filing grievances and lawsuits by denying him proper medical care for his claimed "rupture," in violation of the First Amendment;**

**Count 4:** **Defendants denied Mlaska equal protection of the law, in violation of the Fourteenth Amendment, when they refused to properly treat him because of his race or bias against prisoners with medical conditions that are sexual in nature;**

**Count 5:** **Defendants deprived Mlaska of due process of law, in violation of the Fifth and Fourteenth Amendments, when they failed to inform of him of his test results, declined to order the tests that were recommended by medical experts, and vested all decision making authority regarding treatment in Wexford;**

**Count 6:** **Defendants are liable for tortious conduct against Mlaska under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2689, *et seq*.;**

**Count 7:** **Defendant David committed medical battery or medical negligence when subjecting Mlaska to unnecessary prostate exams, in violation of Illinois state law;**

**Count 8:** **Defendants caused Mlaska to suffer from intentional infliction of emotional distress when they denied him adequate medical care for his "rupture," in violation of Illinois law.**

The parties and the Court will use these designations in all future pleadings and orders, unless otherwise directed by a judicial officer of this Court. The designation of these counts should not be construed as an opinion regarding their merit.

As discussed in more detail below, the claims that pass muster under Section 1915A include the Eighth Amendment deliberate indifference to medical needs claim (**Count 1**), the § 1983 civil conspiracy claim (**Count 2A**), the First Amendment retaliation claim (**Count 3**), and the Illinois intentional infliction of emotional distress claim (**Count 8**). These claims shall proceed against the defendants identified in connection with each claim below.

All remaining claims are subject to dismissal, including the § 1985 conspiracy claim (**Count 2B**), the Fourteenth Amendment equal protection claim (**Count 4**), the Fifth and Fourteenth Amendment due process claims (**Count 5**), the FTCA claim (**Count 6**), and the Illinois medical negligence and/or medical battery claim (**Count 7**).

**A.      Dismissal of Non-Parties and Unaddressed Claims**

Mlaska's amended complaint nearly runs afoul of Rule 8 of the Federal Rules of Civil Procedure. *See* FED. R. CIV. P. 8(a) (complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief" and also "a demand for the relief sought"); *see also* FED. R. CIV. P. 8(d)(1) (allegations "must be simple, concise, and direct"). The pleading spans 100 pages. It is poorly organized and at times utterly confusing. Many allegations focus on events that occurred prior to Mlaska's incarceration at Shawnee and are therefore superfluous. Mlaska regularly refers to individuals, who are not named as defendants in this action, e.g., "Jim," Sheppard, Beagle, Matticks, Butalid, Johnston, Walblay, Talbot, Woods, etc. He also

refers to exhibits that the Court could not find with the 93-page original complaint (Doc. 1) or the 100-page amended complaint (Doc. 12).

Because of the poor organization of the amended complaint, it is possible that the Court overlooked one or more claims asserted therein. Any claims not mentioned above should be considered dismissed *without* prejudice to Mlaska asserting said claim(s) in an amended complaint filed in this action or in a separate action. In addition, any defendants not listed in the case caption should also be considered dismissed without prejudice from his action. *Myles v. United States*, 416 F.3d 551 (7th Cir. 2005) (for an individual to be properly considered a party under Rule 10, he must be "specif[ied] in the caption").

## B.   Count 1 – Deliberate Indifference to Medical Needs

The Eighth Amendment deliberate indifference to medical needs claim (**Count 1**) shall proceed against Defendants Schicker, Hilliad, Etienne, David, Lynn, Wexford, Miller, and Hunter (in his official capacity only). However, Count 1 shall be dismissed *without* prejudice against Defendants Martin, IDOC, Godinez, Baldwin, and Hunter (in his individual capacity only).

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see Erickson v. Pardus*, 551 U.S. 89, 94 (2006) (*per curiam*). Deliberate indifference involves a two-part test. The plaintiff must show that (1) the medical condition was objectively serious, and (2) the state officials acted with deliberate indifference to his medical needs, which is a subjective standard. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011). Mlaska's medical condition, which includes a suspected "rupture" of a blood vessel in his penis

and associated pain, is sufficient to support an Eighth Amendment claim at this early stage in litigation.

The allegations also suggest that Defendants Schicker, Hilliad, Etienne, David, and Lynn may have responded to Mlaska's medical needs with deliberate indifference. According to the amended complaint, each of these defendants was responsible for providing ineffective testing and treatment, despite recommendations from Mlaska's specialist(s) for alternative tests. The Eighth Amendment does not entitle Mlaska to "demand specific care" or "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). It merely prohibits treatment that amounts to cruel and unusual punishment. Mlaska is only "entitled to reasonable measures to meet a substantial risk of serious harm." *Id.* Therefore, even if Mlaska's treatment is substandard, negligent, or grossly negligent, his Eighth Amendment claim would fail.

But Mlaska claims that he was denied the very diagnostic tests that his specialist(s) recommended. Because this testing was denied, his symptoms persisted, and his condition allegedly remained undiagnosed and untreated. Continuing to pursue an ineffective course of treatment can be evidence of deliberate indifference. *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 862 (7th Cir. July 22, 2015) (citing *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)). This is particularly true where the medical providers fail to exercise medical judgment or respond inappropriately to the inmate's ailments. *Id.* "A delay in treatment may constitute deliberate indifference if the delay exacerbate[s] the injury or unnecessarily prolong[s] an inmate's pain." *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). This is exactly what Mlaska alleges, and he shall be allowed to proceed with Count 1 against Defendants Schicker, Hilliad, Etienne, David, and Lynn.

Mlaska shall also be allowed to proceed with this claim against Wexford. *Respondeat superior* liability does not apply to private corporations under § 1983. *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982). Therefore, Wexford cannot be held liable under § 1983 "unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). Mlaska claims that a number of Wexford's policies, customs, or practices resulted in inadequate medical care (e.g., Wexford's delayed processing of referrals, approval of clearly ineffective diagnostic tests, emphasis on cost of care over the quality of care, and failure to train staff). On this basis, Count 1 shall also proceed against Wexford.

The Court also cannot dismiss Count 1 against Defendant Miller at this early stage. Mlaska alleges that this defendant sent an email to Shawnee medical staff in 2012 that referred to him as a "troublemaker" and a "perverted malinger" (Doc. 12, pp. 11-12). Although Mlaska describes what might be characterized as name-calling, the Court cannot ignore the possibility, or even likelihood, that these statements from one of Mlaska's health care providers represented Defendant Miller's attempt to impede Mlaska's access to adequate medical care at Shawnee. *See Beal v. Foster*, -- F.3d --, No. 14-2489 (7th Cir. Oct. 2, 2015); *but see DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) (standing alone, verbal harassment, name calling, and rude comments by prison staff generally do not constitute cruel and unusual punishment). For this reason, the claim against Defendant Miller shall also receive further review.

The amended complaint supports no Eighth Amendment claim against Defendants Martin or Hunter. Generally speaking, the allegations against these defendants are threadbare and do not pass muster under *Twombly*. Moreover, the allegations simply do not suggest that either defendant exhibited deliberate indifference toward Mlaska's medical needs. Mlaska alleges that

Defendant Martin (Shawnee's former warden) explained that he could not "make" Defendants Schicker or Martin "do anything," and Defendant Hunter (Shawnee's current warden) told Mlaska that Wexford would not pay for the exact testing he requested (Doc. 12, pp. 9, 13).  Non-medical staff members, like Defendants Martin and Hunter, are generally entitled to defer to medical staff regarding the choice of diagnostic testing.  *See Burks v. Raemisch*, 555 F.3d 592, 593 (7th Cir. 2009).  Their comments are reflective of their roles and not of deliberate indifference.  Absent more specific allegations of their direct involvement in the denial of medical care, Count 1 shall be dismissed without prejudice against Defendants Martin and Hunter.

No viable Eighth Amendment claim has been articulated against Defendants IDOC, Godinez (former IDOC director), or Baldwin (acting IDOC director).  These defendants allegedly created policies, customs, or practices that deprived Mlaska of adequate medical care.  Significantly, Mlaska does not identify *which* ones are attributable to these defendants or explain how they resulted in the deprivation of adequate medical care.  Mlaska's allegations against Defendant IDOC, Godinez, and Baldwin are unsupported and conclusory.

Beyond this, he cannot maintain a money damages claim against the IDOC or the state employees (any of them) in their official capacities.  The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  *See also Norfleet v. Walker*, 684 F.3d 688, 690 (7th Cir. 2010) (suing state employee in his or her official capacity is the same as suing the state); *Wynn v. Southward*, 251 F.3d 588, 592 (7th Cir. 2001) (Eleventh Amendment bars suits against states in federal court for money damages); *Billman v. Ind. Dep't of Corr.*, 56 F.3d 785,

788 (7th Cir. 1995) (state Department of Corrections is immune from suit by virtue of Eleventh Amendment).

To be held individually liable, a defendant must be "'personally responsible for the deprivation of a constitutional right.'"  *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)).  Although Mlaska alleges that Defendants Godinez and Baldwin created policies, customs, or practices that deprived him of adequate medical care, he does not describe *which* ones led to this deprivation or explain how the policy resulted in the denial of his medical care.  His allegations of individual liability against Defendants Godinez and Baldwin are too conclusory and vague to support a viable claim against them.

However, Mlaska does seek injunctive relief, and such claims typically proceed against a defendant in his or her official capacity.  Defendant Hunter (Shawnee's current warden), acting in his official capacity, is the party best suited to respond to this request for relief.  This is because Defendant Hunter would be responsible for carrying out any injunctive relief that is ordered.  Mlaska expresses concern that he will be transferred from Shawnee, mooting any injunctive relief that is ordered.  However, the new warden may be substituted for Defendant Hunter, if this occurs.  *See Gonzalez v. Feinerman*, 663 F.3d 311 (7th Cir. 2011) (substituting new warden as the proper party for an official capacity claim for injunctive relief because he or she would be responsible for ensuring that any injunctive relief is carried out).  Defendant Hunter shall remain in this action in his official capacity, based solely on Mlaska's request for injunctive relief.

In summary, **Count 1** shall proceed against Defendants Schicker, Hilliad, Etienne, David, Lynn, Wexford, Miller, and Hunter (in his official capacity only).  This claim shall be dismissed

*without* prejudice against Defendants Martin, IDOC, Godinez, Baldwin, and Hunter (in his individual capacity only).

## C.     Count 2 - Conspiracy

Mlaska shall be allowed to proceed with his civil conspiracy claim (**Count 2A**) under § 1983 against Defendants Miller, Schicker, Etienne, David, Hilliad, Lynn, and Wexford, but no other defendants (Doc. 12, pp. 15-16).  Civil conspiracy claims are cognizable under § 1983, but they provide no independent basis of liability.  *Lewis v. Washington*, 300 F.3d 829, 831 (7th Cir. 2002) (recognizing conspiracy claim under section 1983); *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008); *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 324 (7th Cir. 2000).  "There is no constitutional violation in conspiring to cover-up an action which does not itself violate the Constitution."  *Hill v. Shobe* 93 F.3d 418, 422 (7th Cir. 1996).  Generally, "it is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date." *Walker v. Thompson*, 288 F.3d 1005, 1007-08 (7th Cir. 2002).  *See also Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003); *Tierney v. Vahle*, 304 F.3d 734, 740 (7th Cir. 2002).

Mlaska alleges that all of the defendants evinced a "longstanding willingness" to "undertreat and underdiagnose" him (Doc. 12, pp. 15-16, 22-23).  But a "willingness" is different than an agreement or an action to deny an inmate medical care.  To the extent that this claim gains any traction at all in the amended complaint, it is against the defendants who are subject to Count 1, i.e., Defendants Schicker, Hilliad, Etienne, David, Lynn, Wexford, and Miller.  No plausible conspiracy claim is alleged against the other defendants.

The amended complaint does not support a conspiracy claim under § 1985 (**Count 2B**) against any of the defendants.  Under the intracorporate conspiracy doctrine, a § 1985 conspiracy claim "cannot exist solely between members of the same entity."  *Payton v. Rush Presbyterian-*

*St. Luke's Med. Ctr.*, 184 F.3d 623, 632 (7th Cir. 1999). The defendants are all members of the same entity, the Illinois Department of Corrections, and they were all working in the IDOC's interest. Therefore, they cannot be sued under § 1985 for conspiracy. *See id. See also Wright v. Ill. Dep't Of Children and Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994).[12] And to the extent Mlaska's conspiracy claim specifically arises under § 1985(3), which prohibits a conspiracy to deprive another of equal protection under the law, recovery is only permitted from a private actor who has conspired with state actors. *Turley v. Rednour*, 729 F.3d 645, 649 n. 2 (7th Cir. 2013) (quoting *Fairley v. Andrews*, 578 F.3d 518, 526 (7th Cir. 2009)). The amended complaint asserts a claim against state actors only. Given this, the § 1985 conspiracy claim does not survive preliminary review.

In summary, the § 1983 civil conspiracy claim in **Count 2A** shall proceed only against Defendants Schicker, Hilliad, Etienne, David, Lynn, Wexford, Miller, and shall be dismissed *without* prejudice against Defendants Martin, IDOC, Godinez, Baldwin, and Hunter. The § 1985 conspiracy claim in **Count 2B** shall be dismissed *without* prejudice against all of the defendants.

**D.     Count 3 - Retaliation**

The amended complaint articulates a viable First Amendment retaliation claim (**Count 3**) against Defendant David, but no other defendant. To state a claim for retaliation, a plaintiff must allege that: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter protected First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the

---

[12] While *Wright* focused on corporate managers, nothing in its reasoning precludes application of this doctrine to supervisors and subordinates in a government entity, as long as all are working in the entity's interest. *Id.* at 633.

retaliatory action." *Perez v. Fenoglio*, 792 F. 3d 768, 783 (7th Cir. July 7, 2015) (quoting *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009)).

Defendant David admittedly refused to send Mlaska for a Doppler study because Mlaska filed a complaint against him (Doc. 12, p. 12). Filing a non-frivolous grievance or lawsuit is a constitutionally-protected activity that supports a retaliation claim. *Id.* (citing *Thomson v. Washington*, 362 F.3d 969, 971 (7th Cir. 2004)). The denial of medical care is a deprivation that is "likely to dissuade a reasonable person from engaging in future First Amendment activity." *Id.* (citing *Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987)). The allegations support Mlaska's retaliation claim against Defendant David.

However, no retaliation claim is supported against any other defendants. Defendants Lynn, Etienne, and Schicker are also named in connection with this claim (Doc. 12, pp. 12-13). Mlaska asserts that Defendants Lynn, Etienne, Schicker, and David "jointly retaliated against him for filing prior complaints and suits attempting to resolve this issue" (Doc. 12, p. 12). He refers to emails authored by Defendant Schicker in support of the claim (Doc. 12, pp. 12-13). The emails do not support his claim of retaliation against these defendants. In a 2010 email, Defendant Schicker agrees "that [Mlaska] seems to be obsessed with this anatomical body part" (Doc. 12-1, p. 15). In a 2012 email, Defendant Schicker describes Mlaska as a "nuisance" (Doc. 12, p. 17). These emails do not amount to retaliation; in the same email, Defendant Schicker asks Defendant Funk to examine Mlaska at Danville to make sure he is not missing anything (*id.*). Mlaska also refers to an index of medical records that were withheld from him based on an exemption under the Freedom of Information Act. These documents simply do not establish a chronology of events which suggest that Defendants Lynn, Etienne, and Schicker (or anyone else) retaliated against Mlaska for filing grievances and lawsuits by denying

him proper medical care. Without more, **Count 3** cannot proceed against anyone other than Defendant David.

**E.       Count 4 – Equal Protection**

The amended complaint does not articulate a viable Fourteenth Amendment equal protection claim (**Count 4**) against any of the defendants. Mlaska alleges that he was denied equal protection of the law under the Fourteenth Amendment because of his race and because of an inherent bias against prisoners who have medical conditions that are sexual in nature.

The Equal Protection Clause of the Fourteenth Amendment prohibits a state from depriving persons within its jurisdiction of equal protection of the laws. U.S. CONST. amend. XIV. Violations of the Equal Protection Clause arise in a variety of contexts.

Mlaska claims, in passing, that he was denied medical treatment because of his race, which is a suspect class. Generally speaking, a plaintiff who asserts an equal protection violation based on race "must establish that a state actor has treated him different[ly] than persons of a different race and that the state actor did so purposefully." *DeWalt*, 224 F.3d at 619 (citing *Washington v. Davis*, 426 U.S. 229 (1976); *Indianapolis v. Minority Contractors Ass'n, Inc. v. Wiley*, 187 F.3d 743 (7th Cir. 1999)). "Purposeful discrimination" indicates that the state actor singled out a particular group for disparate treatment and took action with the intention of causing an adverse effect on the identifiable group. *Shango v. Jurich*, 681 F.2d 1091, 1104 (7th Cir. 1982).

Mlaska describes no such thing in the amended complaint. He merely states, in conclusory fashion, that he was denied medical treatment because of his race. He fails to offer any allegations in support of the claim. Even at this early stage, the Court cannot "accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."

*Brooks*, 578 F.3d at 581.   Accordingly, Mlaska's race-based equal protection claim fails and shall be dismissed.

Mlaska also alleges that he was subject to discrimination, based on his membership in a special subclass of prisoners who have medical conditions that are sexual in nature.   According to Mlaska, he would have received adequate medical care, if his condition affected his foot or arm instead of his genitals.   The class he describes is not a suspect class.   The challenged classification would likely qualify for review under the "rational basis" test, which requires individuals to show: (1) the defendants treated him differently from other similarly situated individuals; (2) because of his status as a prisoner with a medical condition that is sexual in nature; and (3) this differential treatment was not rationally related to a legitimate government interest. *See id.*

This claim suffers from the same problem as the race-based equal protection claim. Mlaska does not plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.   Accordingly, this claim cannot proceed.

This is the true, even when construed as a "class of one" equal protection claim.   A "class of one" claim arises when a plaintiff alleges that he has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).   Mlaska's allegations to this effect are conclusory and, at best, speculative.   Accordingly, the equal protection claim based on his membership in a subset of prisoners with medical conditions that are sexual in nature also states no claim upon which relief may be granted.    Under the circumstances, **Count 4** does to survive preliminary review and shall be dismissed *without* prejudice.

F.      **Count 5 – Due Process**

The amended complaint is peppered with references to due process violations under the Fifth and Fourteenth Amendments (**Count 5**).  The claims generally fall into three categories: (1) a claim that the defendants failed to inform Plaintiff of his test results; (2) a claim that the review process used to approve treatment recommendations resulted in unnecessary delays and denials of care; and (3) a claim that vesting final decision making authority regarding medical testing and treatment with Wexford resulted in the denial of necessary medical care.

As for the first category, Mlaska claims that he lacked information necessary to understand the nature of his medical condition and to properly assess his treatment options because he was not provided with his test results (Doc. 12, pp. 10, 15-16).  Presumably, he is referring to the results of his 2012 ultrasound, which he repeatedly claims include penile reads that reveal a "rupture."  Consequently, he underwent procedures he would have otherwise refused.

When brought pursuant to the Fourteenth Amendment, claims of this nature generally arise in the context of the right to refuse treatment.  *See Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 278-79 (1990) (a competent person has a constitutionally protected liberty interest in refusing medical treatment); *Washington v. Harper,* 494 U.S. 210, 221–22, 229 (1990) (prisoners possess significant liberty interest in avoiding unwanted administration of antipsychotic drugs); *Vitek v. Jones,* 445 U.S. 480, 494 (1980) (transfer to menial hospital and mandatory behavior modification treatment implicates liberty interests).

Other circuits recognize an independent Fourteenth Amendment claim based on a failure to provide information to a prisoner prior to treatment.  *E.g.*, *Pabon v. Wright,* 459 F.3d 241, 249-50 (2d Cir. 2006); *Benson v. Terhune,* 304 F.3d 874, 884-85 (9th Cir. 2002); *White v.*

*Napoleon,* 897 F.2d 103, 113 (3d Cir. 1990). An inmate asserting a "claim for a violation of [the] due process right to adequate information" in these other circuits "must allege" that "government officials failed to provide him with [adequate] information," that "this failure caused him to undergo medical treatment that he would have refused had he been so informed," and that the "officials' failure was undertaken with deliberate indifference," as it would if medical staff "withheld information from [the prisoner] for the purpose of requiring [the prisoner] to accept [treatment]." *Alston v. Bendheim,* 672 F. Supp. 2d 378, 384 (S.D.N.Y. 2009) (applying the elements from the Second Circuit's *Pabon* decision).

Mlaska essentially claims that he endured certain unnecessary exams (e.g., prostate exam) because he was denied access to the 2012 ultrasound results. This claim overlaps substantially with, and is duplicative of, his Eighth Amendment claim (Count 1) and the Illinois medical battery and/or negligence claim (Count 7) that is addressed below. Mlaska may address these arguments in the context of either or both of those claims. The due process claim shall be dismissed as duplicative of his other claims.

As for the second and third categories of due process claims, the Court reaches the same conclusion. Mlaska's challenges to Wexford's review and approval process under the Fifth and Fourteenth Amendment overlap with, and are duplicative of, his Eighth Amendment deliberate indifference to medical needs claim (Count 1). He is proceeding with that claim against Wexford. It is therefore unnecessary to bring a separate Fifth and/or Fourteenth Amendment due process claim to address what are essentially the same challenges.

**Count 5** shall be dismissed against all of the defendants *without* prejudice.

**G.      Count 6 – FTCA**

The amended complaint mentions the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680, *et seq*. (**Count 6**).  The FTCA provides jurisdiction for suits against the United States regarding torts committed by federal officials, not state officials.  The defendants are not federal officials.  Accordingly, **Count 6** shall be dismissed with prejudice.

**H.      Counts 7 & 8 – Illinois State Law Claims**

Mlaska also asserts two claims under Illinois state law, including one for medical negligence and/or battery (**Count** 7) and one for intentional infliction of emotional distress (**Count 8**).  Where a district court has original jurisdiction over a civil action such as a § 1983 claim, it also has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367(a), as long as the state claims "derive from a common nucleus of operative fact" with the original federal claims.  *Wisconsin v. Ho-Chunk Nation,* 512 F.3d 921, 936 (7th Cir. 2008).  The Court has original jurisdiction over this § 1983 action.  Because the state claims and federal claims allegedly arise from the same facts, the district court also has supplemental jurisdiction over Plaintiff's related state law claims for: (1) medical negligence and/or battery (Count 7); and (2) intentional infliction of emotional distress (Count 8).

<b>Count 7 - Medical Negligence and/or Battery</b>

Mlaska claims that Defendant David's prostate examinations were completed without his informed consent.  As such, they constituted medical negligence or medical battery.  Either way, Mlaska failed to file the necessary affidavit in support of his claim, and **Count 7** shall be dismissed without prejudice.

A defendant can never be held liable under Section 1983 for negligence, or even gross negligence.  *Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Zarnes v. Rhodes*, 64 F.3d 285, 290

(7th Cir. 1995); *Gomez v. Randle*, 680 F.3d 859, 864 (7th Cir. 2012). As the Seventh Circuit has made clear, "medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim." *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997). *See also Snipes v. DeTella*, 95 F.3d 586, 590 (7th Cir. 1996) ("Mere negligence or even gross negligence does not constitute deliberate indifference."). However, the Court has jurisdiction to consider whether a negligence claim has been stated under Illinois state law pursuant to 28 U.S.C. § 1367.

The Court also has jurisdiction pursuant to § 1367 to consider whether a medical battery claim has been stated under Illinois state law. In a medical battery case, an injured party can recover by establishing that (1) there was no consent to the medical treatment performed, (2) the treatment was against the injured party's will, or (3) the treatment substantially varied from the consent granted. *McDonald v. Lipov*, 13 N.E.3d 179, 187 (Ill. App. 2014) (citation omitted). Under these circumstances, a medical battery occurs because the person administering the medical care intentionally touched the person of another without authorization. *Id.*

For either claim, a plaintiff "[i]n any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice," must file an affidavit along with the complaint, declaring one of the following: (1) that the affiant has consulted and reviewed the facts of the case with a qualified health professional who has reviewed the claim and made a written report that the claim is reasonable and meritorious (and the written report must be attached to the affidavit); (2) that the affiant was unable to obtain such a consultation before the expiration of the statute of limitations, and affiant has not previously voluntarily dismissed an action based on the same claim (and in this case, the required written report shall be filed within 90 days after the filing of the

complaint); or (3) that the plaintiff has made a request for records but the respondent has not complied within 60 days of receipt of the request (and in this case the written report shall be filed within 90 days of receipt of the records).  *See* 735 ILL. COMP. STAT. § 5/2-622(a) (West 2013).[13] A separate affidavit and report shall be filed as to each defendant.  *See* 735 ILL. COMP. STAT. § 5/2-622(b).

Failure to file the required certificate/affidavit is grounds for dismissal of the claim. *See* 735 ILL. COMP. STAT. § 5/2-622(g); *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000). However, whether such dismissal should be with or without prejudice is up to the sound discretion of the court.  *Sherrod*, 223 F.3d at 614.  "Illinois courts have held that when a plaintiff fails to attach a certificate and report, then 'a sound exercise of discretion mandates that [the plaintiff] be at least afforded an opportunity to amend her complaint to comply with section 2-622 before her action is dismissed with prejudice.'"  *Id.*; *see also Chapman v. Chandra*, Case No. 06-cv-651-MJR, 2007 WL 1655799, at *4-5 (S.D. Ill. June 5, 2007).

In the instant case, Mlaska has failed to file the necessary affidavit/certificate and report as it pertains to Defendant David.  Therefore, the claim in **Count 7** shall be dismissed.  However, the dismissal shall be without prejudice at this time, and Plaintiff shall be allowed 35 days (**on or before November 20, 2015**) to file the required affidavit if he attempts to revive either the medical negligence *or* medical battery claims.  Should Plaintiff fail to timely file the required affidavits, the dismissal of Count 7 shall become a dismissal with prejudice in this action. *See* FED. R. CIV. P. 41(b).

---

[13] The August 25, 2005, amendments to a prior version of this statute were held to be unconstitutional in 2010.  *Lebron v. Gottlieb Mem. Hosp.*, 930 N.E.2d 895 (Ill. 2010) (Holding P.A. 94-677 to be unconstitutional in its entirety).  After *Lebron*, the previous version of the statute continued in effect. *See Hahn v. Walsh*, 686 F. Supp. 2d 829, 832 n.1 (C.D. Ill. 2010).  The Illinois legislature re-enacted and amended 735 ILL. COMP. STAT. §5/2-622 effective January 18, 2013 (P.A. 97-1145), to remove any question as to the validity of this section.  *See* notes on Validity of 735 ILL. COMP. STAT. § 5/2-622 (West 2013).

**Count 8 - IIED**

Mlaska's claim for intentional infliction of emotional distress (**Count 8**) shall receive further review.  Under Illinois law, a plaintiff claiming intentional infliction of emotional distress must demonstrate that the defendant intentionally or recklessly engaged in "extreme and outrageous conduct" that resulted in severe emotional distress.  *Somberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1030 (7th Cir. 2006); *see Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006).  The tort has three components: (1) the conduct involved must be truly extreme and outrageous; (2) the actor must either intend that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress; and (3) the conduct must in fact cause severe emotional distress.  *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988).  To be actionable, the defendant's conduct "must go beyond all bounds of decency and be considered intolerable in a civilized community."  *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *Kolegas v. Heftel Broad. Corp*., 607 N.E.2d 201, 211 (Ill. 1992); *Campbell v. A.C. Equip. Servs. Corp*., *Inc.*, 610 N.E.2d 745, 749 (Ill. App. 1993). Whether conduct is extreme and outrageous is judged with an objective standard, based on the facts of the particular case.  *Honaker*, 256 F.3d at 490.

At this early stage, the Court will allow **Count 8** to proceed against Defendants Wexford, Schicker, Hilliad, Etienne, David, Miller, and Lynn, but no other defendants.  Mlaska has not been allowed to proceed with any federal claims against the remaining defendants.  Because the federal claims against these defendants shall be dismissed, the Court also declines to exercise supplemental jurisdiction over the related state law claims against them.  *See* 28 U.S.C. § 1367(c)(2)-(4).  This includes all state law claims against Defendants IDOC, Godinez, Baldwin, Hunter, and Martin, which shall be dismissed without prejudice so that Plaintiff can

pursue these claims in state court should he choose to do so.

<u>**Pending Motions**</u>

**A.      Motion for Temporary Restraining Order and/or Preliminary Injunction (Doc. 4)**

Plaintiff's original motion for temporary restraining order in Document 4 was denied by Order dated August 24, 2015 (Doc. 11).  His motion for a preliminary injunction was held in abeyance and shall now be **REFERRED** to a United States Magistrate Judge for further consideration.

**B.      Motion to Appoint Counsel (Doc. 13)**

Plaintiff's motion to appoint counsel (Doc. 13) shall also be **REFERRED** to a United States Magistrate Judge for further consideration.

**C.      Alternate Motion for Prospective Declaratory Judgment (Doc. 14) / Second Motion for Temporary Restraining Order and/or Preliminary Injunction**

Plaintiff filed an alternate motion for prospective declaratory judgment (Doc. 14) on September 24, 2015, along with a proposed order to show cause for temporary restraining order and/or preliminary injunction.  The **CLERK** is **DIRECTED** to file the proposed order to show cause as "Plaintiff's Second Motion for Temporary Restraining Order and/or Preliminary Injunction" in CM/ECF.  The Court construes both motions together as a *second* request for a temporary restraining order and/or preliminary injunction.

In the motions, Mlaska alleges that he suffers from an unconfirmed "groin rupture" (Doc. 14, p. 1).  In 2010, "several doctors" who "suspected a vascular cause" ordered testing.  He has still not received all of the recommended tests.  At this time, Mlaska is *not* seeking *specific* testing, however--just *the* test that will confirm that he suffered a "rupture" (*id*.).  In the meantime, Mlaska alleges that he is experiencing "bleeding into his system via superficial return

veins" and has resorted to tying a cloth around "the rupture spot," a technique he has used for years but that he claims is "becoming less effective as time passes."  He fears that he will suffer a broad range of symptoms that are listed in the motion.

Upon review of both motions and the pleadings filed to date in this action, the Court is of the opinion that a TRO should not be issued at this time.  A TRO is an order issued without notice to the party to be enjoined, and it may last no more than fourteen days.  *See* FED. R. CIV. P. 65(b)(2).  A TRO may issue only if "specific facts in an affidavit or a verified complaint clearly show that immediate or irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition."  FED. R. CIV. P. 65(b)(1)(A).  In order to obtain injunctive relief, whether through a TRO or preliminary injunction, Mlaska must demonstrate that: (1) his underlying case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) he will suffer irreparable harm without it.  *Merritte v. Kessel*, 561 Fed. Appx. 546, 548 (7th Cir. 2014) (citation omitted).  The Court now finds that this standard has not been met.

Although the amended complaint survives threshold review, it is unclear whether the underlying case has any actual likelihood of success on the merits.  Mlaska has filed two other lawsuits addressing many of the same claims.  He lost both cases.  This action represents his third attempt to bring these claims in federal court—this time against officials who treated him at Shawnee.  Although portions of the amended complaint survive preliminary review, the record at this time does not reveal a reasonable or substantial likelihood of success on the merits.

It also appears that Mlaska has not availed himself of other available remedies. His pleadings are devoid of allegations or documentation addressing his efforts to obtain medical care during the past two years.  The obvious exception to this is the April 2015 incident in which

Mlaska cut his own penis (Doc. 12-1, p. 32).  But he admits that he was immediately taken to an outside hospital for treatment and complains of no lingering issues.

Finally, it is very unlikely that a TRO will address his immediate concerns.  The testing he seeks is vague—i.e., whatever test it takes to confirm the suspected 2009 rupture.  And the Court sees little benefit in ordering a battery of tests without first considering the response of the defendants, who treated him for his condition over the course of several years.  The relatively short delay associated with their response should not result in further harm to Mlaska.

He describes no changes to the condition that now warrant immediate attention.  He says that he is in pain but does not describe the level of pain, indicate that it has recently increased, or suggest that he has asked a Shawnee official to help him control his pain levels.  Should his situation change, Mlaska is, of course, free to renew his request for this form of immediate relief.

The second request for a TRO is **DENIED** without prejudice.  However, Mlaska's related requests for a preliminary injunction shall be **REFERRED** for further consideration by a United States Magistrate Judge.

## Disposition

The Clerk is **DIRECTED** to **DOCKET** Plaintiff's proposed order to show cause as "Second Motion for Temporary Restraining Order and/or Preliminary injunction."

**IT IS HEREBY ORDERED** that Plaintiff's second request for a temporary restraining order, set forth in Documents 14 and in the newly docketed "Second Motion for Temporary Restraining Order and/or Preliminary injunction," is **DENIED** without prejudice.

**IT IS HEREBY ORDERED** that the original complaint (Doc. 1), which was replaced by the amended complaint (Doc. 12), is **VOID**.

**IT IS ORDERED** that **COUNTS 2B, 4, 5,** and **7** are **DISMISSED** without prejudice for failure to state a claim upon which relief may be granted.   **COUNT 6** is **DISMISSED** with prejudice on the same grounds.

**IT IS ORDERED** that Defendants **ILLINOIS DEPARTMENT OF CORRECTIONS, GODINEZ, BALDWIN, MARTIN,** and **HUNTER (individual capacity only)** are **DISMISSED** without prejudice from this action.

**IT IS ALSO ORDERED** that as to **COUNTS 1, 2A, 3,** and **8**, the Clerk of Court shall prepare for Defendants **WEXFORD HEALTH SOURCES**, **SCHICKER, HILLIAD, ETIENNE, DAVID, LYNN, MILLER,** and **HUNTER (official capacity only)**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).   The Clerk is **DIRECTED** to mail these forms, a copy of the amended complaint, and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff.   If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.   This information shall be used only for sending the forms as directed above or for formally effecting service.   Any documentation of the address shall be retained only by the Clerk.   Address information shall not be maintained in the court file or disclosed by the Clerk.

Plaintiff shall serve upon Defendants (or upon defense counsel once an appearance is entered), a copy of every pleading or other document submitted for consideration by the Court. Plaintiff shall include with the original paper to be filed a certificate stating the date on which a true and correct copy of the document was served on Defendants or counsel.  Any paper received by a district judge or magistrate judge that has not been filed with the Clerk or that fails to include a certificate of service will be disregarded by the Court.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to **United States Magistrate Judge Stephen C. Williams** for further pre-trial proceedings, including a decision on Plaintiff's motion to appoint counsel (Doc. 13) and consideration of Plaintiff's requests for a preliminary injunction in Documents 4, 14, and the newly docketed "Second Motion for Temporary Restraining Order and/or Preliminary Injunction."  Any motions or other papers filed after the date of this Order that relate to this request for relief or seek leave to again amend the complaint are also **REFERRED** to United States Magistrate Judge Williams.  If it becomes apparent that further action is necessary, the undersigned Judge should be notified immediately. Further, this entire matter shall be **REFERRED** to United States Magistrate Judge Williams for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, notwithstanding the fact that his application to proceed *in forma pauperis* has been granted.  *See* 28 U.S.C. § 1915(f)(2)(A).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts.   This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs.   Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution.   *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED: October 16, 2015**

**s/ MICHAEL J. REAGAN**
**U.S. District Judge**
